IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DOROTHY ANDERSON,<br><br>              Plaintiff,<br><br>    vs.<br><br>PHELPS MEMORIAL HEALTH<br>CENTER,<br><br>              Defendant. | **8:13CV362**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on Defendant Phelps Memorial Health Center's motion for summary judgment on all claims. (Filing No. 36). For the reasons set forth below, Defendant's motion will be granted.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Dancy v. Hyster Co., 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999).

The moving party bears the burden of showing there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, "a party opposing a properly supported motion for summary judgment 'may not rest upon the

mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)) (internal marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 251-52 (internal citations omitted).

STATEMENT OF FACTS

The undisputed facts, and those which are considered undisputed for the purposes of this motion only, are as follows:

Defendant, Phelps Memorial Health Center ("PMHC") is a nonprofit health center located in Holdrege, Nebraska. Plaintiff Dorothy Anderson began her employment with PMHC in 1976 as a registered nurse. In 2012, Anderson worked as the Director of Outpatient Services and as a Case Management RN. Sue Hardessen was hired when PMHC transitioned to a case management system, and she directly supervised Anderson when she worked in Case Management.

Case management is an approach to coordinating patient care which includes patients and their families in their plan of care, coordinates services among a multidisciplinary care team, and ensures patients are covered by insurance. Case management assists in avoiding the denial of care to patients and ensuring appropriate care. As a Case Management RN, Anderson was responsible for coordinating after-patient care and evaluating the ongoing needs of patients following their discharge from PMHC. This required Anderson to communicate with patients and physicians, as well as other medical providers both within and outside of PMHC.

Hardessen met with Anderson and Maria Ritter, Anderson's coworker in PMHC's Case Management Department, on a weekly basis to discuss goals for the case management system and ongoing training concepts. Hardessen regularly communicated her expectations and mentored Anderson and Ritter on case management. Hardessen frequently communicated her expectations and provided training to Ritter and Anderson, including enrolling them in an ongoing online course, and providing various in-person trainings. Anderson understood the goals of case management and concedes it was crucial to PMHC to provide the best possible care to patients by achieving the goals of case management.

Hardessen conducted Anderson's annual performance evaluation in July of 2012 and gave Anderson a score of 3.36/5.00. This score shows Anderson's "[p]erformance [met] expectations for position" and was "effective both in achieving results and in demonstrating a competent level of behavior skills." (Filing No. 46 ¶ 27 at CM/ECF p. 9). The July performance evaluation represented a "look back" at Anderson's performance from the previous year. Hardessen had supervised Anderson for a sufficient amount of time to competently complete Anderson's 2012 evaluation and Hardessen believed the evaluation truly and accurately reflected Anderson's performance. (Id. ¶ 81 at CM/ECF p. 26). Hardessen believed Anderson was working toward PMHC's case management goals and expectations, and Hardessen evaluated Anderson based on the observations and the knowledge available to Hardessen at the time.

In October of 2012, Anderson and Ritter attended a case management training conference in Boston. During this week, Hardessen covered Anderson's case management duties. It was the first time Hardessen completed Anderson's daily work on an extended basis. Hardessen discovered work discrepancies indicating Anderson was disregarding Hardessen's directions on how case management should be conducted. (Filling No. 37 ¶ 34 at CM/ECF p. 11). Hardessen believed Anderson's conduct was

deceptive; that is, Anderson appeared outwardly to be implementing PMHC's case management plan when she was actually doing things her own way and disregarding Hardessen's directions. (Filing No. 37 ¶ 34 at CM/ECF p. 11). Specifically, Hardessen discovered:

a. Patients did not know Anderson was their case manager and were not aware [PMHC] provided case management;
b. Patients' needs were not being met;
c. Patients, and their families, were not aware of the patients' discharge needs, and the [PMHC] care team was not aware of the patients' discharge needs; and
d. Third party providers, such as nursing homes, had concerns about Anderson's performance.

(Filing No. 37 ¶ 35 at CM/ECF p. 11). While covering Anderson's duties, Hardessen received complaints about Anderson, including a call from a patient's son complaining that Anderson stated his father could not be transferred back to PMHC, (Id. ¶ 36 at CM/ECF p. 11), and a call from the director of a local nursing home who was upset because Anderson denied the patient's admission to PMHC. (Id.). Based upon her observations, Hardessen's now believed Anderson was still doing her job the way it was done before PMHC implemented case management. (Id. ¶ 37 at CM/ECF p. 12).

Hardessen believed Anderson's conduct was detrimental to PMHC's patients, and detrimental to PMHC's reputation with third party providers and in the community. (Id. ¶ 39 at CM/ECF p. 12). Anderson did not understand the negative impact of denying care to PMHC patients. (Id. ¶ 38 at CM/ECF p. 12). Hardessen no longer trusted Anderson and did not believe PMHC could trust Anderson to represent the hospital in the work she was asked to perform. (Id. ¶ 40 at CM/ECF p. 12). Hardessen felt an urgent response was needed: Hardessen wanted no more calls notifying about a patient in desperate need who had been led to believe they could not rely upon PMHC to provide care. (Id. ¶ 41 at CM/ECF p. 12).[1]

Additionally, Hardessen discovered Anderson was dedicating significant amounts of work time to non-work matters and was not dedicating work hours to case management work. (Id. ¶ 48 at CM/ECF p. 13). Apart from her work, Anderson was the chairman of the Holdrege Airport Authority ("HAA") for which she would attend hour-long monthly meetings. (Filing No. 46 ¶ 43 at CM/ECF p. 17). While completing Anderson's duties, Hardessen received numerous phone calls related to HAA business and learned Anderson had listed her PMHC phone number on the HAA website. Anderson was also an appointed member of the Nebraska Department of Aeronautics ("NDA"). In her role with the NDA, Anderson attended four to six meetings per year in Lincoln, Nebraska.

Based on her suspicions, Hardessen examined Anderson's time cards and noticed Anderson failed to use paid time off ("PTO") for at least four days (July 4, 2012; September 3, 2012; October 5, 2012; and October 12, 2012) when Hardessen knew Anderson was not at work. For example, on October 12, 2012, Anderson attended a NDA meeting and did not utilize PTO. (Filing No. 37 ¶ 50 at CM/ECF p. 14). Hardessen never asked Anderson whether she forgot to record her PTO hours or if her actions were intentional. (Filing No. 46 ¶¶ 94, 96 at CM/ECF p. 29).

PMHC's Time Card Policy requires an employee's compensable time to be clearly documented and approved on the employee's time card. Pursuant to this policy, salaried exempt employees automatically receive compensation. Employees use PTO to be compensated for days the employee is not at work and must enter the PTO into PMHC's time keeping system. Otherwise, the employee is improperly compensated for time during which the employee neither worked nor used PTO. As a result of Anderson's failure to accurately document her PTO, she was paid her regular salary despite being

absent and not using any of her banked PTO hours.  (Filing No. 37 ¶ 57 at CM/ECF p. 15).

Based on her discoveries, Hardessen met with PMHC's then-Human Resources Leader, Cindy Jackson and recommended ending Anderson's employment.  (Id. ¶ 58 at CM/ECF p. 16).  During the meeting, Hardessen and Jackson prepared documentation summarizing their conversation of the alleged violation of PMHC's Time Card Policy and Anderson's failure to implement case management.  (Id. ¶ 59 at CM/ECF p. 16). Jackson and Hardessen believed Anderson's violation of the Time Card Policy warranted immediate dismissal pursuant to Section IV of PMHC's Disciplinary Process policy.  (Id. ¶ 60 at CM/ECF p. 16).  Hardessen and Jackson also felt Anderson's disregard for PMHC's case management goals and expectations warranted immediate dismissal.  (Id. ¶ 61 at CM/ECF p. 16).  Neither Jackson nor Hardessen suggested or required an investigation into Anderson's alleged violations.  (Filing No. 46 ¶ 97 at CM/ECF p. 29).

Rather than terminating Anderson, Hardessen and Jackson decided to offer Anderson the opportunity to resign.  (Filing No. 37 ¶ 62 at CM/ECF p. 16).  If Anderson had refused to resign, PMHC intended to dismiss Anderson and they prepared an alternate Exit Interview form outlining the grounds for Anderson's termination—her violations of the Time Card Policy and her failure to adopt and implement the case management goals and expectations.  (Id. ¶ 63 at CM/ECF p. 17; see also Filing No. 37-17).  Jackson and Hardessen then informed PMHC's Senior Leadership—including Loren Schroder (CFO), and Mark Harrel (CEO)—who approved of  the decision to end Anderson's employment.  (Filing No. 37 ¶ 64 at CM/ECF p. 17; Filing No. 46 ¶¶ 64, 89 at CM/ECF pp. 22, 28).  Jackson and Hardessen met with Anderson on October 30, 2012 and offered Anderson the opportunity to resign; stating  if she did not resign, she would be dismissed.  Anderson was told she was being dismissed because she was not on the same path as PMHC.  Anderson signed the Exit Interview form indicating her employment was ending by "mutual agreement."  Anderson was 58 years old when her

employment at PMHC ended.  Some of Anderson's duties were absorbed by Hardessen, who was 56 years old, and others were assigned to Karen Flanigan.  ([Filing No. 37-3 at CM/ECF p. 57](#)).

During her employment, Anderson knew PMHC had a policy which prohibited discrimination against any employee due to age (or being a member of any protected class).  PMHC's non-discrimination policy directed employees to report any incidents of harassment or discrimination immediately to their Department Leader, the CEO, or the Human Resources Leader.  Anderson knew Hardessen, (her supervisor), Jackson (the Human Resources Leader), and Harrel (CEO).  And she knew where their offices were located and felt comfortable talking with each of them.  However, Anderson never complained to anyone during the course of her employment or the time her employment ended, regarding any alleged harassment or discrimination.

PMHC distributes an Employee Handbook to all employees. Anderson received the PMHC Employee Handbook and signed an acknowledgement of receipt.  PMHC's Employee Conduct Policy states any employee who fails to perform his/her job satisfactorily or displays inappropriate or unacceptable conduct will be subject to discipline which will be determined based on the severity of each situation.  ([Filing No. 37 ¶ 13 at CM/ECF p. 7](#)).

PMHC's Board of Directors mandated a Disciplinary Process for discipline of its employees.  The Disciplinary Process was a progressive policy which reserved immediate dismissal for the most severe offenses and would typically start with the least severe penalty and progress through the possible disciplinary actions.  PMHC handles each disciplinary situation on a case-by-case basis.  ([Filing No. 37 ¶ 14 at CM/ECF p. 7](#)).

The Disciplinary Process provided four levels of discipline, starting with Verbal Warning (Level I), Written Warning (Level II), Suspension (Level III), and Dismissal (Level IV). PMHC's Disciplinary Process states

> Previous Disciplinary Action older than 180 days shall not be considered when administering a warning notice. Cumulative warnings within the 180 day period may result in an increased in the Level of severity. Two active Verbal or Written Warnings must occur before dismissal may occur.
>
>     a.  **Verbal Warning** shall consist of a meeting between the employee, supervisor and/or Department Leader. Detail of the warning, corrective action and consequences shall be addressed. A written report shall be maintained by the Department Leader and forwarded to Human Resources.
>
>     b.  **Written Warning** shall consist of a meeting between the employee, the supervisor and/or Department Leader. Detail of the warning, corrective action and consequences shall be addressed in writing on the Disciplinary Report. Written Discipline shall remain active for 180 days…
>
>     c.  **Suspension With/Without Pay** may be imposed in writing when verbal or written warning, or Administrative Probation does not provide sufficient discipline for the offense. Suspension is generally used to allow the employer time to compile facts or data. Suspension shall not exceed 20 work days. The employee shall be informed that dismissal may occur if there is no positive corrective action….
>
>     d.  **Dismissal** may occur during an Administrative Probation or Suspension if there is no positive corrective action. A Dismissal may occur without verbal or written warning based on the severity as outlined in examples in Level IV.

Immediate dismissals were reserved for serious violations, including, but not limited to verbal or physical abuse or assault of patients, guests or staff, abandonment of patients, theft, intentional falsification of time cards, falsification of hospital records, and other serious offenses. PMHC's Disciplinary Process further stated, "[a]ll employees of [PMHC] are employed for an indefinite term, and employment may be terminated, without cause, at any time, at the will of either the employee or the organization." (Id. ¶ 15 at CM/ECF p. 8). Anderson understood her employment at PMHC was at-will and she had no contractual right to continued employment. (Id. ¶ 11 at CM/ECF p. 7). In her 36 years of employment with PMHC, Anderson was issued one disciplinary action in

August, 2011—fourteen months prior to her dismissal. (Filing No. 46 ¶ 75 at CM/ECF p. 23).

A week before Anderson's dismissal, Carl Jacobsen was separated from employment with PMHC. (Id. at CM/ECF p. 34). Jacobsen was employed as a Maintenance Supervisor in the Maintenance department under the supervision of Roger Wertenberger. (Filing No. 48 at CM/ECF p. 37). Schroder decided to end Jacobsen's employment after Jacobsen suggested he wished to leave his employment with PMHC. (Id. at CM/ECF p. 36). PMHC was also unhappy with Jacobsen's performance. (Id. ¶ 74 at CM/ECF p. 37). Three months before his separation, Jacobsen's annual performance evaluation stated he was meeting expectations. (Filing No. 46 at CM/ECF p. 43). Like Anderson, Jacobsen filed a lawsuit against PMHC alleging age discrimination. See Jacobsen v. Phelps Memorial Health Center, 8:13-cv-360.

ANALYSIS

Anderson's complaint alleges her employment was terminated due to age in violation of the Nebraska Age Discrimination in Employment Act ("NADEA"), Neb. Rev. Stat. §§ 48-1001 et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (Filing No. 1-1 at CM/ECF p. 4).

BURDEN OF PROOF

The ADEA and NADEA prohibit employers from taking adverse employment actions against employees because of their age. Lewis v. St. Cloud State Univ., 467 F.3d

1133, 1136 (8th Cir. 2006).[2]  Such claims may be proved by either direct or circumstantial evidence.  Id.

In the absence of direct evidence, the plaintiff may show discrimination through the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Gibson v. Am. Greetings Corp., 670 F.3d 844, 855 (8th Cir. 2012).  Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing she (1) was at least forty years old when the adverse action was taken; (2) suffered an adverse employment action; (3) was meeting her employer's legitimate expectations at the time of the adverse employment action; and (4) was replaced by someone substantially younger.  Id. at 856.

If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  Lake v. Yellow Transp., Inc., 596 F.3d 871, 873 (8th Cir. 2010).  If the defendant provides such a reason, the final burden lies with the plaintiff to show that the defendant's proffered reason is a mere pretext for discrimination.  Lewis, 467 F.3d at 1137.  To succeed in proving age discrimination, a plaintiff "must show, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."  Gibson, 670 F.3d at 856 (quoting Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011)).

Anderson has met her burden of proving the first two elements of a prima facie case alleging age discrimination: She was 58 years-old when her employment ended, and she suffered an adverse employment action.

---

[2] The NADEA closely parallels the ADEA and the court analyzes them in conformity. Rickert v. Midland Lutheran College, No. 8:07cv334, 2009 WL 2840528, *14 n.6 (D. Neb. Sept. 2, 2009) (citing Allen v. AT&T Techs., Inc., 423 N.W.2d 424, 427–28 (Neb. 1988)).

The parties dispute whether Anderson was qualified or meeting PMHC's expectation at the time she was dismissed. The qualification necessary is minimal: "[A] plaintiff must show only that [she] possess the basic skills necessary for performance of the job." Haigh, 632 F.3d at 469 (quoting McGinnis v. Union Pacific Railroad, 496 F.3d 868, 874 n.4 (8th Cir. 2007).[3] "A plaintiff should not be tasked with anticipating and disproving [her] employer's reasons for termination during her prima face case." Haigh, 632 F.3d at 470. Although the defendant claims Anderson completely failed to implement case management, evidence exists creating a genuine issue as to whether Anderson possessed the basic skills necessary to complete her case management duties.

Regarding the final element, Anderson states her replacement was substantially younger. Upon Anderson's termination, Hardessen and Flanigan each assumed some of Anderson's duties. At that time Hardessen was 56 years-old—two years younger than Anderson. Although Flanigan's age is not confirmed, in Anderson's July 2015 deposition, Flanigan is identified as 54 years-old.[4] (See Filing No. 48-2 at CM/ECF p. 5). Taken as true, Flanigan is six to seven years younger than Anderson. Flanigan was brought out of retirement to work at PMHC. (See Filing No. 48 at CM/ECF p. 18). These circumstances are not sufficient to show Anderson was replaced by someone substantially younger. See Girten v. McRentals, Inc., 337 F.3d 979, 982 (8th Cir. 2003) ("The nine-year age difference between [the plaintiff] and his replacement may not be sufficient to infer age discrimination."); Wittenburg v. Am. Expr. Fin. Advis., Inc., 464 F.3d 831, 840 (8th Cir. 2006) (holding the hired candidate who was six years younger

---

[3] Eighth Circuit law is split on the standard to apply. See Haigh, 632 F.3d at 469-70. Previous cases have held that the plaintiff must prove she was actually meeting the employer's legitimate expectations while others have held it is enough for the plaintiff to show she had the skills necessary to perform the job. Id. For the purposes of summary judgment, the lower standard—requiring the employee have the basic skills—will be applied.

[4] The only evidence in the record is the following discussion in Anderson's deposition: "Q. Do you know Ms. Flanigan's age? A. No. Q. If I represent to you that she's approximately 54 years old, do you have any reason to dispute that? A. No."

than the plaintiff was not "substantially younger").  Anderson fails to present sufficient evidence to establish a prima facie case under the ADEA.

Plaintiff reasons the fourth element of a prima facie case can be proved by showing Defendant's proffered reason for ending Plaintiff's employment was a pretext for age discrimination.  See Lake, 596 F.3d at 874.  PMHC explains it "ended Anderson's employment because of its belief that Anderson (1) repeatedly violated the Time Card Policy by failing to use PTO for absences from work; and (2) completely failed to adopt the case management goals and expectations of [PMHC]."  (Filing No. 37 at CM/ECF p. 26).  PMHC has articulated a legitimate, nondiscriminatory justification for ending Anderson's at-will employment.  See Floyd v. Missouri Department of Social Services, Division of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999) ("The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence.").

"When an employer articulates a nondiscriminatory reason for an employment action, the factual inquiry proceeds to a new level of specificity."  Rahlf v. Mo-Tech Corp., 642 F.3d 633, 638 (8th Cir. 2011) (internal citation omitted).  "The showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for an employment action.  A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus."  Haigh, 632 F.3d at 470 (internal citation omitted).

Anderson denies falsifying her time records and states she requested PTO for any time she took off.  She says it was her "pattern and practice over 36 years of employment to request PTO" and "she would have entered PTO if she was away."  PMHC disagrees and provides (1) Hardessen's testimony that Anderson was off-work on the specified dates, (See Filing No. 37-3 at CM/ECF pp. 47–50), (2) the official minutes for the

October 12, 2012 NDA meeting listing Anderson's presence, (See Filing No. 37-15 at CM/ECF p. 3), and (3) the pay sheet showing Anderson received regular pay for the specified dates. (See Filing No. 37-12; Filing No. 37-3 at CM/ECF p. 49). Anderson testified she does not recall whether she was absent from work on each of the dates. (Filling No. 37-2 at CM/ECF pp. 44–45). Anderson's testimony is not sufficient to rebut PMHC's evidence and create a genuine issue for trial. See To v. U.S. Bancorp, 651 F.3d 888, 893 (8th Cir. 2011) ("[Plaintiff's] lack of memory does not create a genuine factual dispute.").

In the alternative, Anderson argues she had permission to be absent for HAA and NDA meetings, and PMHC benefited from her activities. She states doctors flew into the Holdrege Airport for business at PMHC and PMHC used her HAA volunteer hours to keep its non-profit status and remain in community publications. Although PMHC benefitted from Anderson's activities, Anderson does not allege they became part of her job; they were still personal duties. Under PMHC's Employee Handbook and Time Card Policy, in addition to requesting time off, an employee must enter PTO into PMHC's time keeping system. (See Filing No. 37-7 at CM/ECF pp. 9, 11; Filing No. 37-13 at CM/ECF pp. 2, 3). Anderson states she was familiar with this reporting and approval process. (Filing No. 37-2 at CM/ECF p. 44). She concedes she was required to obtain her department leader's approval and to use and report PTO when completing personal matters. (See Filing No. 37-2 at CM/ECF pp. 37, 44). Anderson's argument that she received permission does not negate her duty to request and record PTO.

Anderson argues PMHC's second proffered reason—that she had performance deficiencies—has no basis in fact. To support this contention, Anderson states that immediately before her termination, PMHC sent Anderson to case management training in Boston, and only three months before her dismissal, completed a 2012 Performance Evaluation with 'glowing' remarks about Anderson's work. Anderson argues

"Hardessen had her pulse on the workings and performance of the small unit and the employees," and had worked with Anderson long enough to complete a "truthful and accurate evaluation." But Anderson's arguments do little to discredit the performance deficiencies discovered in October. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834–35 (8th Cir. 2002) (determining a days-old favorable review was insufficient to discredit the employer's proffered reason since the employer did not know the employee's performance issues at the time of the review). At the time of the evaluation and when it sent Anderson to the conference, PMHC did not know Anderson was failing to implement case management strategies and goals. Anderson admits Hardessen did not 'job-shadow' the plaintiff on a regular basis, and the conference week was the first time Hardessen stepped into Anderson's role for an extended period. While Anderson attended the conference, Hardessen gained a greater understanding of Anderson's performance. PMHC discovered multiple deficiencies, including complaints from patients and other healthcare facilities. Thereafter, Jackson and Hardessen felt a sense of urgency to protect PMHC's patients and community reputation. (See Filing No. 37-3 at CM/ECF pp. 42–44; Filing No. 37-4 at CM/ECF pp. 21–22).

Anderson contends PMHC has changed its proffered reasons for her dismissal throughout the case's progression. Anderson states "Jackson alleges that Anderson was terminated for falsification of time sheets and 'cumulative performance' issues. Hardessen testified that alleged falsification of time cards was the sole reason Anderson was fired. Jackson alleged that Anderson was fired because she (a) falsified time cards, (b) falsified hospital records and (c) had 'cumulative performance issues.'" (Filing No. 46 at CM/ECF p. 41).

"Pretext may be shown . . . with evidence that the employer's proffered reason for its employment decision has changed substantially over time." Morris v. City of Chillicothe, 512 F.3d 1013, 1019 (8th Cir. 2008). Changes to the proffered reason are

only probative if the discrepancy is substantial. Id.; Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014) (*en banc*). Stating a proffered reason in different wording or explaining additional aspects of the reason are not substantial changes. See Smith, 302 F.3d at 835; Loeb v. Best Buy Co., 537 F.3d 867, 873 (8th Cir. 2008).

Upon review of all the evidence of record, the court concludes changes in the proferred reasons, if any, were not substantial. In addition to the timecard issue, Hardessen testified that a culmination of issues, including performance issues, led Hardessen to believe Anderson's continued employment would be detrimental to PMHC. (See Filing No. 37-3 at CM/ECF pp. 42–44). Regarding Jackson's alleged inconsistency/change, Jackson and PMHC considered time cards to be hospital records. As such, the falsification of a time sheet is the falsification of a hospital record. (See Filing No. 37-4 at CM/ECF p. 17).

Hardessen and Jackson prepared an Exit Interview form in October of 2012 in case Anderson had to be dismissed. This form clarified the reasons for dismissing Anderson:

> During [Anderson's] absence for offsite training the week of October 15 several issues were brought by staff, physicians and other healthcare partners to the attention of Sue Hardessen and validated. [Anderson] has taken personal days off and not used PTO (most recently on Oct. 5 and 12) which is falsification of timecard[s] and reason for termination. The other issues are related to her not meeting the expectations of a Department Leader and Case Manager including not "managing up" leadership, incomplete rounding logs, not following case management direction, inadequate documentation of patient care, inadequate documentation of staff time allocation and overall lack of follow through and/or communication with internal and external customers.

(Filing No. 37-17 at CM/ECF p. 2). Additionally, Hardessen's notes, dated October 30th, detail Anderson's performance and time card issues. (See Filing No. 48-7 at CM/ECF p.

2). All reasons offered and stated by PMHC and its employees have consistently supported the proposition that Anderson was fired for cumulative performance issues and a failure to request PTO. Any inconsistencies are either additional facts or alternative ways of stating the original reasons.

Anderson attempts to raise an inference of pretext by stating "younger employees were treated differently" and "'the majority'" of PMHC employees are purportedly younger than her and still employed at PMHC. (Filing No. 37-2 at CM/ECF pp. 56, 57). Anderson specifically points to Hardessen's preferable treatment of another PMHC employee, Paula Keffeler. Anderson claims:

> Hardessen wrote up a subordinate employee (who was in her 40s), Paula Keffeler, for performance issues. Ms. Keffeler had numerous performance issues raised by co-workers and doctors that lead to her discipline. Keffeler wasn't terminated for the multitude of complaints lodged against her; however, Keffeler was substantially younger than Anderson.

(Filing No. 46 at CM/ECF p. 33).

A plaintiff may demonstrate pretext by showing an employer "treated similarly-situated employees in a disparate manner." Lake, 596 F.3d at 874. "To be able to introduce evidence comparing the plaintiff to other similarly situated employees in a discrimination case, the other employees must have been 'similarly situated to the plaintiff in all relevant aspects.'" Knight v. Auto Zone, Inc., 494 F.3d 727, 734 (8th Cir. 2007) (quoting Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 – 92 (8th Cir. 2002)). The compared individuals "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014) (internal citation omitted); see also Knight, 494 F.3d at 734 ("Employees are not similarly situated if they have engaged in differing degrees of misconduct."); Forrest, 285 F.3d at 691–92 (plaintiff not similarly situated when plaintiff's disciplinary record was more serious than the compared employees).

16

Keffeler was supervised by Hardessen, a doctor complained to Hardessen about Keffeler's attitude, a nurse reported Keffeler was difficult to work with, and Keffeler was disciplined on one occasion for being unable to complete a procedure. (Filing No. 48-3 at CM/ECF pp. 16–17). But there is no evidence that Keffeler had multiple performance deficiencies or violated the Time Card Policy on multiple occasions. (See Filing No. 48-3 at CM/ECF pp. 16–18). The court concludes Anderson and Keffeler had differing degrees of alleged misconduct and were not similarly situated, and PMHC's failure to terminate Keffeler—a younger woman—is not relevant and provides no evidence supporting a claim of pretext.

Anderson alleges disparate treatment by Jackson. She states "[w]hen pay record mistakes occurred with PMHC's other employees . . . Jackson would discuss those issues with the employee and did not fire those employees for such errors." Anderson alleges she was simply dismissed, without the opportunity to discuss the PTO issue with Jackson or explain why it happened.

Jackson testified that she spoke with hourly employees who forgot to clock in or out, or who failed to request PTO and therefore received less than their full pay, (Filing No. 44-3 at CM/ECF pp. 27–28). However, she could not recall any employee other than Anderson who falsified a time card and received more pay than was owed. (Filing No. 44-3 at CM/ECF pp. 28–30). Anderson's alleged conduct was not the same or similar to the conduct of those who received counseling from Jackson—the comparison fails. Anderson has presented no evidence showing similarly-situated employees were treated better than Anderson.

Anderson asks the court to take judicial notice of evidence within the case of Jacobsen v. Phelps Memorial Health Center.[5]  The court will take judicial notice of the Jacobsen pleadings if they are relevant.

Anderson points to evidence filed in Jacobsen to show "PMHC has separated many, many over forty employees and replaced them with younger employees."  In Jacobsen, the plaintiff listed over a dozen older employees who were separated from employment with PMHC and replaced by younger workers.  In its memorandum and order, the court concluded that  in the absence of any factual context explaining the employment separations, the listing was "a mere general allegation, and not the 'sufficient, specific evidence' needed to survive a summary judgment motion."   See Jacobsen v. Phelps Memorial Health Center, 8:13-cv-360, Filing No. 47 at CM/ECF p. 13.  Jacobsen's evidence is of no value in this case.

Anderson relies on the record in Jacobsen to show a similarly-situated employee (Jacobsen) was terminated from PMHC.  Plaintiff claims Anderson and Jacobsen were similarly treated because (1) they were separated from their respective employments with PMHC within a week of one another; (2) they were both part of an age-based protected class—Anderson was 58 and Jacobsen was 63; (3) neither was subject to disciplinary action 180 days prior to their separations; (4) both had received "meets expectations" ratings on their July 2012 Performance Evaluations; (5) in each case, PMHC's HR Policies and Procedures were allegedly violated; and (6) they were both fired by Jackson with the approval of  Schroder and Harrel.  (Filing No. 46, at CM/ECF pp. 43–44).

"The question of whether evidence of discrimination [against other employees] by other supervisors is relevant in an individual ADEA case is fact based and depends on

---

[5] Jacobsen v. Phelps Memorial Health Center was dismissed on October 14, 2015. See Jacobsen, (Filing No. 47 and 48).

many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." Quigley v. Winter, 598 F.3d 938, 951 (8th Cir. 2010) (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379 (2008)). This court must engage in a "fact-intensive, context-specific inquiry" to determine whether such evidence is relevant. Factors affecting the relevancy of "me too" evidence in employment discrimination cases include "whether the alleged discriminatory behavior by the employer is close in time to the events at issue in this case; whether the same decision-makers were involved; whether the witness and the plaintiff were treated in a similar manner; and whether the witness and the plaintiff were otherwise similarly situated." Barnett v. PA Consulting Group, Inc., 35 F. Supp. 3d 11, 22 (D.D.C. 2014). Of particular significance is whether the same decision-makers were involved. See Harris v. Dinesh Chand, 506 F.3d 1135, 1140 (8th Cir. 2007) ("When employees have been terminated by different decision makers, it would be rare for them to be considered similarly situated because any difference in treatment may well be attributable to nondiscriminatory reasons."); Bell v. Crown Mgmt., LLC,  884 F. Supp. 2d 1222, 1236 (D. Ala. 2012) ("To be probative, the other incidents must implicate a common decision maker."); Abernathy v. S. Star Cent. Gas Pipeline, No. 12-2144, 2013 WL 3013572, at *10 (D. Kan. June 17, 2013) ("Courts often reject 'me too' evidence that involves employees terminated by a different decision-maker.").

Plaintiff stresses Jackson, Schroder, and Harrel were involved with the separation of both Anderson and Jacobsen. However, Jackson and Harrel were not the decision makers for either case. Schroder made the final decision for Jacobsen's separation while Hardessen recommended Anderson's dismissal. See Harris, 506 F.3d at 1141 (differentiating the involvement of HR personnel and supervisors in making termination decisions). Harrel is PMHC's CEO, Schroder is PMHC's CFO, and Jackson was PMHC's then-Human Resources Leader. It is typical that they were involved in the

termination of employees at PMHC, but they were not the final decision makers of both cases.

The cases of Anderson and Jacobsen are further separated by their areas of work, supervisors, and the manner of their respective removals. Anderson worked in patient case management under the supervision of Hardessen: Jacobsen worked in maintenance under Wertenberger. Anderson was removed because she allegedly falsified time records and was failing to complete her duties: Jacobsen was removed for poor performance and PMHC's belief he was unhappy with his employment. No evidence of harassment or discrimination is provided for either case.

Anderson argues PMHC failed to follow its Disciplinary Process when firing her, thus showing an inference of discrimination. Anderson states, as written, the policy only mandates dismissal of 'intentional' time card falsification and there is no evidence Anderson's PTO violations were intentional. Therefore she concludes PMHC violated the Disciplinary Process.

A company's failure to follow its own policies may be evidence of discrimination. Lake, 596 F.3d at 874. However, where there is otherwise "no evidence creating a reasonable inference that age was a determinative factor in termination," the employer's failure to follow a human resources policy does not create such an inference on its own. See Haas v. Kelly Servs., 409 F.3d 1030, 1036 (8th Cir. 2005); see also Lake, 596 F.3d at 876 ("[T]he fact that an employer may have deviated from its . . . policies, *when coupled with* the fact that the company mischaracterized the plaintiff-employee's [actions] in a manner giving rise to negative connotations, lends support to an inference of improper motive.") (emphasis added, internal citation omitted). "[A]n employer 'can certainly chose how to run its business,' including not to follow its own personnel policies regarding termination of an employee . . . 'as long as it does not unlawfully discriminate

in doing so.'" Barber v. Cl Truck Driver Training, LLC, 656 F.3d 782, 795 (8th Cir. 2011) (internal citations omitted).

Under PMHC's Disciplinary Process, dismissal is warranted after two verbal or written disciplinary warnings or "based on the severity as outlined in examples in [the Disciplinary Process]." (Filing No. 37-10 at CM/ECF p. 3). Conduct warranting dismissal under the Disciplinary Process includes "falsification of hospital records" and "intentional falsification of time card[s]." While supervisors were expected to follow the different stages of the Disciplinary Process's progressive policy, the Disciplinary Process also stated, "[a]ll employees of [PMHC] are employed for an indefinite term, and employment may be terminated, without cause, at any time, at the will of either the employee or the organization." (Filing No. 37-10 at CM/ECF p. 5). Anderson conceded she was an at-will employee and had no contractual right to continued employment.

PMHC maintains Anderson's conduct was sufficient to warrant immediate dismissal under the Disciplinary Process. PMHC claims a time card is a hospital record. Therefore, Anderson's conduct was a falsification of a hospital record and didn't need to be intentional to warrant dismissal. (Filing No. 37-4 at CM/ECF p. 17, Filing No. 37-3 at CM/ECF p. 24).[6] Additionally, the Disciplinary Process specifies the violations listed are merely "examples" and are "not expected to cover all situations." (Filing No. 37-10 at CM/ECF p. 3).[7] Each dismissal is judged "based on its severity" of the violation. (Id.). Jackson and Hardessen both testified that even though it was not listed as a Level IV violation, Anderson's case management deficiencies were serious enough that an urgent

---

[6] PMHC also argues that the decision makers thought they complied with its Disciplinary Process and acted in good faith. Although there is no evidence that Anderson intentionally falsified her time card, Hardessen testified she believed the PTO violations were intentional based upon the multiplicity of violations within the three-month period.

[7] The violations listed in Level IV are described as "examples" more than once in the five-page Disciplinary Process.

response was necessary—the hospital could no longer rely upon Anderson to protect the interests of patients and the hospital.  (See Filing No. 37-3 at CM/ECF pp. 42–44; Filing No. 37-4 at CM/ECF pp. 21–22).

Even if PMHC failed to follow its Disciplinary Process when dismissing Anderson, that failure must be coupled with other facts that support an inference of discrimination.  The evidence is not sufficient to show younger, similarly-situated employees were treated better.  And there is no evidence of record indicating Anderson was subjected to harassment based on age, or that PMHC management or Anderson's supervisors referenced Anderson's age in their evaluations and decisions.  While working for PMHC, Anderson never complained of discrimination or harassment, and she raised no such complaints when her employment ended.

Considered in the totality, the evidence sufficiently articulates a nondiscriminatory reason for PMHC's termination of Anderson.  Anderson attempts to raise a reasonable inference of discrimination or pretext by stating: (1) "Defendant never asked Anderson if she falsified her hours;" (2) "PMHC never gave Anderson an opportunity to explain nor did PMHC officials further investigate the matter;" (3) Hardessen requested Ritter keep a log/notes of Anderson's comings and goings from the hospital; (4) Anderson was not given an opportunity to respond to her August 2011 written discipline "or [asked] for her side of the story;" and (5) no other employees were fired in violation of the Disciplinary Process.

The court finds these arguments are without merit.  Anderson was an at-will employee.  So long as age discrimination was not a basis for their evaluations and decisions, Anderson's supervisors and the PMHC administrators retained the right to discipline or terminate Anderson for any reason (or no reason at all), whether Anderson agreed with the reason or not.  In short, PMHC was permitted to ignore its own

Disciplinary Process and dismiss Anderson so long as it did not do so because Anderson was 58-years-old.

In response to Defendant's motion for summary judgment, Anderson was required to produce specific facts which supported a reasonable inference that she was separated from her PMHC employment based on age. After parsing through the record, and considering all reasonable inferences in Plaintiff's favor, Anderson has failed to meet her burden.

THE COURT HEREBY ORDERS:

1) Plaintiff's Motion to Take Judicial Notice, (Filing No. 42), is granted to the extent that the pleadings are relevant.

2) As to all claims alleged in the plaintiff's complaint, the defendants' motion for summary judgment, (Filing No. 36), is granted.

3) A separate judgment will be entered in accordance with this memorandum and order.

Dated this 6th day of November, 2015

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge